## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Lisa A. Starkey,                                    Civil No. 07-1948 (DWF/SRN)

　　　　　　　Plaintiff,

v.                                                  **MEMORANDUM**
                                                    **OPINION AND ORDER**

City of Burnsville, Minnesota,

　　　　　　　Defendant.

_____

William James Mavity, Esq., Mavity & Associates, counsel for Plaintiff.

Patricia Y. Beety, Esq., and Jana M. O'Leary Sullivan, Esq., League of Minnesota Cities, counsel for Defendant.

_____

## INTRODUCTION

This matter is before the Court upon the Motion for Summary Judgment filed by Defendant City of Burnsville, Minnesota ("City") in which the City requests that the Court award summary judgment regarding discrimination claims brought against it by Plaintiff Lisa Starkey ("Starkey"). For the reasons set forth below, the Court grants in part and denies in part the City's motion.

## BACKGROUND

Starkey was hired by the City as a paramedic/firefighter in 1999. In April 2003, Starkey was diagnosed with multiple sclerosis ("MS"). Starkey experienced "flare ups" of symptoms due to MS several times during her employment with the City, and each

time took sick leave until her symptoms resolved.  (Aff. of Jana O'Leary Sullivan ("Sullivan Aff.") ¶ 2, Ex. 1 at 58-59, 68, 70, 72-73.)  Starkey was on medical leave due to her MS from April 9, 2003 until May 13, 2003; July 26, 2003 until August 3, 2003; September 23, 2004 until October 4, 2004; and December 9, 2005 until January 2, 2006. During these flare ups, Starkey experienced a variety of symptoms, including blurred vision, vertigo, stuttering, slurred speech, and fatigue.  After each flare up, Starkey returned to work after being cleared by her own physician.

Starkey returned to work after her last flare up on January 3, 2006.   The City contends that, soon after that, Starkey experienced continuing physical problems related to her MS and that these problems impacted her job performance.  On January 16, 2006, Captain John Deutsch ("Deutsch") wrote a letter regarding Starkey to Assistant Fire Chief Bill Schaetzel ("Assistant Chief Schaetzel"), with a copy to Fire Chief Steve Harklerode ("Chief Harklerode").  (Sullivan Aff. ¶ 14, Ex. 13.)  Deutsch wrote that two of Starkey's co-workers approached him, "with [Starkey's] best interest in mind," to discuss concerns about Starkey's performance.  (*Id*.)  Deutsch wrote that Starkey's driving had been impacted "probably due to vision."  (*Id*.)  Deutsch stated that Kyle Engen ("Engen"), a fellow firefighter, reported that Starkey bumped against the curb six or more times during one shift on January 14, 2006, that Starkey told him she had a "little trouble seeing at dusk," and that she had backed the ambulance into the garage bay at an angle.  (*Id*.)  Deutsch also noted that Starkey's "strength [was] noticeably decreased," and that Mike Klarich ("Klarich"), another firefighter, reported that Starkey banged a stair

2

chair[1] on the stairs as she brought it in on a call, and that she had difficulty disconnecting a hose[2] that he believed was already loose.  (*Id*.)  Deutsch further stated that Starkey had also asked for Engen's assistance in plugging in a shore line.[3]

After Deutsch's report, the City asked Starkey to undergo a fitness for duty evaluation and referred her to Dr. Kevin Wall at the Park Nicollet Clinic-Airport. Starkey did not object to being seen for the evaluation.  Starkey denies, however, that she was continuing to experience symptoms related to MS and disputes the City's characterization of these incidents.

The record reflects that Starkey disputed these events during her appointment with Dr. Wall.  A Report of Evaluation Physical prepared by Dr. Wall on January 23, 2006, notes that Dr. Wall shared Deutsch's letter with Starkey and that Starkey "was not aware of these issues," and "did take some issue with" the letter.  (Sullivan Aff. ¶ 20, Ex. 19.) The Report of Evaluation Physical also states that Starkey indicated she felt her "strength and vision [were] back to normal," that Starkey took care of a hobby farm, carrying bales of hay and buckets of water, and that Starkey also reported exercising regularly at her health club.  (*Id.*)

During her deposition in this case, Starkey continued to dispute the incidents to which Deutsch referred in his letter.  She stated that she told Engen that she had

---

[1]      A stair chair is a piece of equipment used to transport patients down the stairs.

[2]      This was a large diameter, approximately six-inch, hose that needed to be disconnected from the pump panel of the fire engine.

[3]      A shore line is an electrical cord that plugs into the side of an ambulance.

experienced some problems with vision at night due to steroids she was taking during her last flare up, but stated that when Engen asked whether she was still experiencing problems, she indicated she was not. (Sullivan Aff. ¶ 2, Ex. 1 at 80.) Starkey stated that she bumped the curbs because she was talking to Engen in the ambulance and was not paying attention, and that she parked the ambulance at an angle because the mirrors fogged as she backed the ambulance into the garage and she was unable to see where the vehicle was in relation to the lines. (*Id*. ¶ 2, Ex. 1 at 80-84.) She stated that she banged a stair chair on some stairs because the stairs were slippery, and denied telling co-workers that she needed help or was having difficulty carrying the stair chair. (*Id*. ¶ 2, Ex. 1 at 84-85.) Starkey stated that she had difficulty disconnecting a large diameter hose from a fire engine because she did not have the wrench needed to disconnect the hose; she left to get the wrench and when she returned Klarich had removed the hose. (*Id*. ¶ 2, Ex. 1 at 87.) Starkey stated that she asked Engen for assistance in plugging in a shore line, that she did not typically need assistance, and that she did not know why she had experienced difficulty with this task on that occasion. (*Id*. ¶ 2, Ex. 1 at 86-87.)

Starkey submitted to the fitness for duty evaluation and was examined by Dr. Wall on January 23, 2006. Dr. Wall's Report of Evaluation Physical states that Starkey stated that she felt she had returned to work "a little bit too early," and Starkey indicates that she told Dr. Wall that "in hindsight, 20/20, maybe I returned too early." (*Id*. ¶ 2, Ex. 1 at 102.) According to Starkey, however, she made this statement because she was "back there seeing him," and not because of problems with her physical condition. (*Id*.) After the examination, Dr. Wall wrote that "it is likely [Starkey] should be able to resume

4

work," though he also stated that some skill or functional capacity testing would be appropriate to ensure that Starkey was able to meet the full demands of her job.  (Sullivan Aff. ¶ 20, Ex. 19.)

Starkey alleges that Dr. Wall told her that she could go back to work, and a Work Ability Report signed by Dr. Wall referencing the appointment on January 23, includes the statement that Starkey could "[r]eturn to work with no limitations" on February 1, 2006, and that Dr. Wall "[a]dvise[d] monitoring skills/function as she resumes FF/Paramedic activities."  (Aff. of Lisa Starkey ("Starkey Aff.") ¶ 30, Ex. M.)  Dr. Wall contacted Sue White-Blake ("White-Blake"), a Human Resources staff member, and told her that he was releasing Starkey back to work with no limitations.  (Sullivan Aff. ¶ 5, Ex. 4 at 41.)  White-Blake expressed to Dr. Wall that she had additional concerns about Starkey returning to work without limitations, though she does not remember telling Dr. Wall that he should impose limitations on Starkey's work authorization.  (Id. ¶ 5, Ex. 4 at 42.)  According to White-Blake, Dr. Wall stated he wished to discuss Starkey's case with his partner, Dr. Kipp,[4] and after this consultation, Dr. Wall recommended that Starkey undergo a functional capacity evaluation.  (Id. ¶ 5, Ex. 4 at 43-45.)

According to Starkey, Dr. Wall called her and indicated he had spoken with the City, that Starkey would be required to undergo a functional capacity test, and that he had rescinded the authorization to return to work.  Dr. Wall prepared a revised Work Ability

---

[4]     White-Blake indicated that she understood that Dr. Wall considered Dr. Kipp to have special expertise in evaluating firefighters, and that Dr. Kipp had worked with other fire departments, though the City had never worked with Dr. Kipp in the past.  (Sullivan Aff. ¶ 5, Ex. 4 at 43-44.)

Report, on which the authorization to return to work without limitations was crossed out, and Dr. Wall wrote that Starkey could return to work on February 2, 2006, with the limitation that Starkey was not to do structural firefighting.  (Starkey Aff. ¶ 32, Ex. O.) Dr. Wall also crossed through his statement that Starkey's skills and function should be monitored, and replaced this statement with:  "Advise skills/function/FCE prior to resuming FF/Paramedic activities."  (*Id.*)  Starkey returned to work on light duty and performed fire inspections.[5]

Starkey underwent a functional capacity evaluation on February 8 and 9, 2006, at Park Nicollet Clinic in St. Louis Park, Minnesota.  Therapist Lori S. Anderson ("Anderson") performed the evaluation, which lasted approximately four hours each day. Anderson prepared a Functional Capacity Evaluation Summary Report ("FCE Summary Report"), which noted that Starkey performed all tasks asked of her to her maximum abilities, and that Starkey passed, scoring in the "Heavy-Very Heavy Physical Demand Category."  (Sullivan Aff. ¶ 21, Ex. 20.)  The FCE Summary Report indicates that the evaluation included physical testing specific to firefighter skills and was designed to simulate tasks firefighters must perform.  These tasks included carrying an apartment pack,[6] doing a hose raise, performing an equipment carry exercise, performing a roof

---

[5]     Fire inspections are one category of tasks performed by the City's firefighter/paramedics.

[6]     An apartment pack is a canvas bag carried on the shoulder in which firefighters carry hoses.

ventilation exercise, and doing a victim drag test.[7]  Starkey admits that these exercises were simulations, and stated that Anderson "did her best to give [Starkey] the test with the equipment [Anderson] had, but it didn't resemble what [firefighters] use in the field." (Sullivan Aff. ¶ 2, Ex. 1 at 127.)  The FCE Report Summary indicates that Anderson recommended that Starkey return to full duty in her position with the City.

Starkey returned to work again on February 16, 2006.  On March 7, 2006, Jamie Gerard ("Gerard"), a co-worker of Starkey's, sent a memorandum to Chief Harklerode and Assistant Chief Schaetzel, in which he expressed concerns about "glaring issues" with Starkey's performance during shifts on March 3 and March 5.  (Sullivan Aff. ¶ 24, Ex. 23.)  Gerard reported that Starkey expressed to him three times that she was "very sorry" and that she "felt like a loaf today not being able to lift patients" the way she normally would.  (*Id*.)  Gerard also reported that Starkey told him she "felt extremely wiped out and didn't [have] a lot of energy."  (*Id*.)  Gerard noted that Starkey struggled to lift "a heavy drunk guy," and they lifted him up only halfway; when the patient commented that Starkey was unable to lift him, Gerard stated Starkey responded to the patient by telling him, "you need to lose some weight."  (*Id*.)  Gerard felt this was unprofessional.

Gerard reported that on one call Starkey had difficulty stopping an oxygen tank from leaking and required assistance from another firefighter.  Gerard also indicated that Starkey drove over a large, decorative rock by a patient's driveway and the back tire of

---

[7]     The victim drag test involved dragging a 165-pound mannequin fifty feet in one direction and fifty feet back in the other direction.

the ambulance went over the rock.  Gerard stated Starkey said she had not seen the rock, and that neither of them observed any damage to the truck.  Gerard also reported that Starkey experienced difficulty carrying a patient on a stretcher backwards down a hallway, that Starkey passed the patient off to another firefighter, and that Starkey told him she was "tired and wiped out" from their last few shifts.  (*Id.*)

Also on March 7, Firefighter Dunham ("Dunham"), who was acting captain, completed an Incident/Supplementary Report, in which he stated that Starkey approached him that morning at the shift change and told him she should not lift because she "fried her back last shift."  (Sullivan Aff. ¶ 23, Ex. 22.)  They were immediately called to a medical emergency, and Dunham noticed that Starkey was "somewhat hesitant regarding lifting" the patient, that she stumbled on some steps, and that she was struggling when carrying the stretcher.  (*Id.*)  Dunham indicated he sought Starkey out to ask her if she was alright, and that Starkey became emotional, that she said she was "too weak on the last call," and that she was not "OK."  (*Id.*)  Dunham reported that Starkey talked about the "frustrations of her disease," the "weakness she has encountered as a result of many busy shifts, with little rest," and that Starkey admitted that she tripped going up the steps due to feeling weak.  (*Id.*)  Dunham also reported that Starkey said she was tired and frustrated, was afraid of losing her job, and that Starkey realized that she "was not able to perform in strenuous situations such as fire situations."  (*Id.*)

On March 8, 2006, Captain Lee LaTourelle ("LaTourelle") completed an Incident/Supplementary Report regarding the reports made by Gerard and Dunham. (Sullivan Aff. ¶ 25, Ex. 24.)  LaTourelle's report summarizes the incidents Gerard and

Dunham reported, and identifies the "glaring issue" LaTourelle had witnessed to be Starkey's tendency not to "engage quickly," to be "sluggish" to react.  (*Id*.)  LaTourelle also expressed his personal opinion that Starkey was not ready to return to work.

Starkey disputes these events, as well as any connection between them and her MS.  Starkey denies that she experienced any unusual fatigue or loss of strength after she returned to work on February 16, 2006.  Starkey denied telling Gerard she was "wiped out" and unable to lift patients; Starkey recalls telling Gerard only that she was tired. (Sullivan Aff. ¶ 2, Ex. 1 at 128-129.)  Starkey did not remember struggling with the heavy, drunk patient, or telling him he needed to lose weight, and explained that she might have spoken more freely with the patient because "if you wake [her] up in the middle of the night, you might hear what's in [her] mind."  (*Id*. ¶ 2, Ex. 1 at 129-130.) Starkey was unable to recall any incident in which she struggled with a patient's oxygen mask.  She remembered driving over the decorative rock at the patient's house, noting that she had not seen it in her mirror and that she and Gerard were unable to see any damage to the ambulance.  (*Id*. ¶ 2, Ex. 1 at 131-133.)

Starkey indicates she did have trouble at work during the shifts referenced in the reports, but denies that it was related to weakness due to MS.  She indicated she tripped on the steps because the steps were at different heights.  She struggled walking down a hall backwards with the stretcher because her back was extremely sore from a call the night before, and because the patient's feet were positioned between her legs.  Starkey agrees that she said she was tired, and that she went home from work that day due to her physical condition.  She acknowledged stating that she feared losing her job, and that she

told Dunham that she was concerned about her ability to perform that day due to the back injury.  Starkey denies, however, telling Dunham about her disease, and indicates that Dunham simply made an assumption about her MS.

Following these events, Starkey was told she was being placed on administrative leave and that she would be required to undergo additional testing.  Starkey agreed to do the testing because she "just wanted to come back to work."  (Sullivan Aff. ¶ 2, Ex. 1 at 143.)  The City hired a physical therapist, Jonathan Reynolds ("Reynolds"), to conduct a second functional capacity evaluation.  Reynolds is not a physician.  Reynolds does most of his functional capacity evaluations at job sites; he stated at his deposition that this is a "fairly new thing," and that he does not "know of anybody else around the city that does it."  (Sullivan Aff. ¶ 3, Ex. 2 at 39.)  Reynolds had never conducted an evaluation for a firefighter before and did not have a copy of the City's firefighter job description.  (Sullivan Aff. ¶ 3, Ex. 2 at 54, 60.)  Instead, Reynolds used the U.S. Department of Labor's Directory of Occupational Titles to ascertain the skills necessary for firefighting.

Starkey's testing took place on March 29, 2006, and consisted of two parts.  The first portion of the testing took place at City Hall in Burnsville and lasted 3.5 hours.  During this portion of the testing, Reynolds interviewed Starkey, and then began testing Starkey physically.  At Reynold's direction, Starkey climbed up and down flights of stairs, did a step test in which she stepped in time with a metronome and balance testing for which she stood on one leg, repeatedly lifted a box in which the weight was increased in 10 pound increments until it weighed 70 pounds, and lifted up to 30 pounds over her head.  Starkey also reported being asked to do repetitive squats.  Starkey indicated she

did not take breaks during this testing and that she did not ask for a break because she did not know if she could take one.  Reynolds did not recall whether Starkey took any sitting or standing rest breaks, or whether she had any water while she was undergoing the testing.

Reynolds measured Starkey's heart rate during the test and indicated that her heart rate was above the maximum allowable aerobic target.  Reynolds indicated that the heart rate reading could show that Starkey was aerobically fatigued, or that she had poor cardiovascular fitness.  Reynolds also observed that Starkey had difficulty during the step test keeping time with the metronome.  Reynolds noted that Starkey put forth "excellent effort" and agreed during his deposition that Starkey was trying her best to complete the tasks he gave her.  (Sullivan Aff. ¶ 3, Ex. 2 at 63.)

The second portion of the test took place immediately after Starkey's testing at City Hall.  Starkey traveled four or five minutes to the City's fire station and there she took a physical ability test that the City began giving to entry-level firefighters in 2000, after Starkey was hired.[8]  As she was already an existing employee at the time the City

---

[8]      There is some dispute over how long Starkey was at the fire station before the test started.  Starkey indicates that it took less than ten minutes to set up the test after she arrived, and that she stood by while Reynolds and Russ Lalim ("Lalim") set up the test. Reynolds, on the other hand, indicates that forty-five minutes elapsed between the time they left City Hall and the time she started taking the City's firefighter physical ability test and that he and Lalim set up the test together after they arrived at the fire station. Lalim indicates that the test was "all set up and ready to go" when they arrived, and that he had already set up the test so there would not be any "lag time . . . when they were ready for the test."  (Sullivan Aff. ¶ 8, Ex. 7 at 30-31.)

adopted this test, Starkey had never been required to take the physical ability test before. Starkey was administered the test by Reynolds and Russ Lalim, a fellow firefighter.

Lalim observed Starkey having problems during the test. He noticed difficulties with her ability to climb during the apartment pack carry; initially Starkey did not appear tired, but her "gait was off," and on the way down the stairs she "definitely at this point appeared to be exhausted." (Sullivan Aff. ¶ 8, Ex. 7 at 32-33.) Lalim also observed Starkey having an unsteady gait during the hose drag, that she looked weak and exhausted during the roof ventilation exercise,[9] that she dropped the dummy several times during the victim drag, and that she was unable to complete the stretcher carry portion of the test.[10] Reynolds observed and timed Starkey during the test. He observed one instance in which Starkey exhibited clonus, which is a lack of muscle control of the calf muscle, for a few seconds when Starkey was "kind of standing on her toes." (Sullivan Aff. ¶ 3, Ex. 2 at 86-88.) Reynolds also stated that he saw Starkey stumble on the stairs and that he observed Lalim grab Starkey's jacket to stabilize her.[11] It is undisputed that Starkey did not complete the test within the time required by the testing standards the City used.

---

[9]    This test involves carrying a maul to the roof, where the firefighter is required to raise the maul over his or her shoulder and strike a roof simulator thirty times, simulating breaking a hole in the roof.

[10]    The stretcher carry test requires the firefighter to carry an approximately 108 pound weighted stretcher up flights of stairs, navigating switchbacks on the way up.

[11]    Starkey disputes this; Starkey said Lalim grabbed her jacket, but she did not lose her footing, and does not know why Lalim grabbed her. (Sullivan Aff. ¶ 2, Ex. 1 at 168-169.)

On April 5, 2006, the City terminated Starkey.  Starkey was placed on administrative leave until June 5, 2006, in order to assist her in fulfilling the waiting period for long-term disability benefits, and Starkey was encouraged to apply for disability benefits.  In its termination letter to Starkey, the City noted the results of Reynold's testing and "documented performance concerns" during the preceding three months, and indicated that Starkey was unable to perform the essential functions of her job.  (Sullivan Aff. ¶ 27, Ex. 26.)  Starkey's personal physician, Dr. Randall Schapiro, who treated her MS and who indicated he had experience treating other firefighters, reviewed Starkey's testing and stated that the testing was "well in the range of normal function," that he failed to understand why Starkey was being deemed physically unfit to be a firefighter, and that Starkey was "capable to do the position that she was hired for." (Starkey Aff. ¶ 43, Ex. AA.)

## DISCUSSION

Starkey alleges her termination was the result of disability and gender discrimination in violation of the Americans with Disabilities Act ("ADA") and Minnesota Human Rights Act ("MHRA").  The City seeks summary judgment as to both of Starkey's claims.

## I.   Standard of Review

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The Court must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party.  *Enter. Bank v. Magna Bank*

*of Mo.,* 92 F.3d 743, 747 (8th Cir. 1996).  A disputed fact is "material" if it must inevitably be resolved and the resolution will determine the outcome of the case, while a dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986); *Planned Parenthood of Minnesota/South Dakota v. Rounds,* 372 F.3d 969, 972 (8th Cir. 2004);  *Fenney v. Dakota, Minnesota & Eastern R.R. Co.,* 327 F.3d 707, 711 (8th Cir. 2003).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.  *Enter. Bank,* 92 F.3d at 747.  The nonmoving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial.  *Krenik v. County of Le Sueur,* 47 F.3d 953, 957 (8th Cir. 1995).  A party opposing a properly supported motion for summary judgment "may not rest upon mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial."  *Liberty Lobby,* 477 U.S. at 256.

## II.   Disability Discrimination Claim

The ADA prohibits discrimination by covered entities against qualified individuals who have a disability.  The ADA defines "disability" as:  "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment."  42 U.S.C. § 12102(2); *see also* Minn. Stat. § 363A.03, subd. 12 (defining a as disabled any person who "(1) has a physical, sensory, or mental impairment which materially limits one or more major life activities; (2) has a record of such an impairment;

or (3) is regarded as having such an impairment."). Starkey contends that she is not disabled, and therefore, her claims fall under the "regarded as" prong of these statutes.

The regulations promulgated under the ADA provide guidance as to the meaning of "substantially limits one or more major life activities." *Weber v. Strippit, Inc.*, 186 F.3d 907, 912 (8th Cir. 1999). "Major life activities" include "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i). Sitting, standing, lifting, and reaching are also considered major life activities. *See Helfter v. United Parcel Serv., Inc.,* 115 F.3d 613, 616 (8th Cir. 1997); *see also Bragdon v. Abbott,* 524 U.S. 624, 639 (1998) (emphasizing that the regulations provide an illustrative, rather than exhaustive, list of major life activities).

Starkey contends the City regarded her as substantially limited in the major life activity of working. To be substantially limited in the major life activity of working, a person must be "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." *Dovenmuehler v. St. Cloud Hosp.*, 509 F.3d 435, 439 (8th Cir. 2007) (citing *Kellogg v. Union Pacific R.R. Co.*, 233 F.3d 1083, 1087 (8th Cir. 2000)). The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working. *Id.*

ADA and MHRA disability discrimination claims are analyzed under the *McDonnell Douglas* burden shifting analysis. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973); *Burchett v. Target Corp.,* 340 F.3d 510, 516 (8th Cir. 2003); *see also*

*Dovenmuehler*, 509 F.3d at 439 n.4 (holding that federal precedent may be used to construe both ADA and MHRA claims).  Under this analytical framework, the employee bears the initial burden of proving a *prima facie* case of discrimination.  *McDonnell Douglas Corp.,* 411 U.S. at 802.  The employer then has the burden to articulate a legitimate, nondiscriminatory reason for the adverse employment action.  *Id.* at 802-03.  Finally, to prevail, plaintiff must show that the defendant's proffered reason was a pretext for discrimination.  *Id.* at 804.  The City argues that Starkey has failed to make a *prima facie* case because she has failed to show that the City regarded her as disabled.  This Court agrees with the City.

Starkey advanced two arguments in support of her claim that the City regarded her as disabled from the major life activity of working.  First, she contends that the City believed her MS was disabling, and cites the City's encouragement that she apply for disability benefits as evidence that the City regarded her as disabled.  The City disputes this claim, and counters by citing *Smith v. City of Des Moines*, 99 F.3d 1466, 1474 (8th Cir. 1996).  In *Smith*, a fire department actually applied for disability benefits on behalf of a fired firefighter; notwithstanding that the Eighth Circuit held that while the city regarded Smith as disabled from his duties as a firefighter, there was insufficient evidence that it regarded Smith as unable to do other jobs.  99 F.3d at 1474; *see also Shipley v. City of Univ. City*, 195 F.3d 1020 (8th Cir. 1999) (holding termination because employer believed plaintiff was unable to be a firefighter, but did not regard plaintiff as disabled from other jobs, did not give rise to cause of action under ADA).

The same is true here.  Indeed, in the same letter informing Starkey of her termination and of possible disability benefits, the City also stated it would inform her of job vacancies with the City so Starkey could determine if she wished to apply for other available jobs.  (Sullivan Aff. ¶ 27, Ex. 26.)  The fact that the City informed Starkey of possible benefits upon her termination and encouraged her to apply for any benefits for which she might qualify does not show that the City regarded her as disabled from other jobs.

Starkey's second argument is that the City regarded her as disabled because it determined that she was unable to do other jobs accomplished by the City's firefighter/paramedics, including fire inspections and fire investigations, and acting as fire marshal.  The City counters that these jobs are not separate from the firefighter/paramedic position, and that its decision that Starkey was unable to perform the duties of a firefighter necessarily excluded Starkey from the other assignments.  Jill Hansen ("Hansen"), a Human Resources employee with the City, indicated in her deposition that these assignments are "bid" by the firefighters, but she stated that persons holding these assignments are required to be able to perform the full range of firefighter duties.  (Aff. of William J. Mavity ("Mavity Aff.") ¶ 6, Ex. D at 41).  At the hearing in this matter, Starkey asserted that the City's argument is a red herring.  Starkey indicated that as firefighters age and are less able to do the most physically demanding firefighting work, they are transitioned into these positions.  While there is a certain logic to Starkey's argument, the record does not contain sufficient facts to support it.  To survive a motion for summary judgment, Starkey may not rely on "mere allegations," but "must

set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P.

56(e).

Further, even if the City considered these to be separate jobs from that of the

firefighter/paramedic position, the City's decision that other jobs at the fire station were

unavailable to her does not establish that the City regarded her as disabled.  In *Sutton v.

United Air Lines, Inc.*, the Supreme Court cited U.S. Equal Employment Opportunity

Commission regulations identifying factors for courts to consider in determining whether

a person is substantially limited in the major life activity of working; these factors

included determining the geographical area to which the person has access, and the

number and types of jobs utilizing similar training, knowledge, skills or abilities, within

the geographical area, from which the individual is also disqualified.  527 U.S. 471, 491-

492 (1999); 29 C.F.R. §§ 1630.2(j)(3)(ii)(A), (B).  The other jobs from which Starkey

was barred at the fire station are a fairly narrow subset of jobs in one very small location

and do not constitute the "class of jobs or a broad range of jobs" within a general

geographical area, as contemplated for a "regarded as" claim.

Viewing the facts in the light most favorable to Starkey, she has shown that the

City erroneously believed that she was unable to be a firefighter.  For the reasons stated,

however, this is not sufficient for Starkey's ADA and MHRA disability discrimination

claims to survive the City's summary judgment motion.

### III.    Gender Discrimination Claim

Starkey alleges that her termination resulted from the City's discrimination on the basis of her gender, in violation of the MHRA.  The City contends that Starkey has failed to support her claim that the City engaged in gender discrimination against her.

The MHRA states that:  "[e]xcept when based on a bona fide occupational qualification, it is an unfair employment practice for an employer, because of  . . . sex . . . to:  . . . (2) discharge an employee; or (3) discriminate against a person with respect to hiring, tenure, compensation, terms, upgrading, conditions, facilities, or privileges of employment."  Minn. Stat. 363A.08, subd. 2.  Claims of gender discrimination under the MHRA are also analyzed under the *McDonnell Douglas* burden-shifting analysis. *McDonnell Douglas Corp.*, 411 U.S. 792; *Anderson v. Hunter, Keith, Marshall & Co., Inc.,* 417 N.W.2d 619, 623-24 (Minn. 1988).  Under this test, Starkey must first prove a *prima facie* case of discrimination, then the burden shifts to the City to articulate a legitimate, non-discriminatory reason for the action, which Starkey can rebut with a showing that the proffered reason is a pretext for discrimination.  *McDonnell Douglas Corp.,* 411 U .S. at 802-03.

In order to establish a *prima facie* case of gender discrimination, Starkey must demonstrate that she (1) is a member of a protected group; (2) was qualified for her job; (3) suffered an adverse employment action; and (4) circumstances exist which create an inference of discrimination.  *Wells v. SCI Mgmt., L.P.,* 469 F.3d 697, 701 (8th Cir. 2006). The fourth element can be met by demonstrating that similarly-situated employees of the opposite sex were treated differently.  *Id.*

Starkey has established a *prima facie* case of gender discrimination.  Starkey is a member of a protected class and it is undisputed that Starkey was terminated, which is an adverse employment action.

Starkey has also produced evidence that she was capable of doing her job; she received ratings of "Fully Qualified Performance" in 2002, 2003, 2004 and 2005, and her personal physician affirms that she is able to function as a firefighter, she was cleared to return to work by Dr. Wall, a physician chosen by the City, and passed a functional capacity evaluation administered to her at the City's behest.  (Starkey Aff. ¶¶ 14, 33, 34, 43, Exs. B, S, T and AA.)  The City only minimally addresses Starkey's gender discrimination claims, but the Court can infer from the City's arguments that it disputes that Starkey was capable of doing her job based on the performance problems it identified, and Starkey's failure to successfully pass Reynold's testing and the physical ability test.  Starkey, however, disputes the performance problems identified by the City, as noted above, and challenges Reynold's testing and the use of the physical ability test as part of the City's discriminatory action.  Starkey argues that the City intentionally subjected her to a physically strenuous test without rest or water breaks, which was designed to wear her out physically, immediately before sending her to do the physical ability test.  While the City argues that Reynold's testing was not physically demanding, Reynolds stated that Starkey's elevated heart rate could be the result of aerobic fatigue, Lalim stated Starkey was exhausted shortly into the physical ability test, and Starkey indicated that she was sore for three days after the testing.  Reynolds also acknowledged that the tests could have been conducted on different days.  Viewing the evidence in the

light most favorable to Starkey, as the Court must at this stage of the case, Starkey has produced sufficient evidence that she was capable of doing her job.

Starkey has also shown circumstances creating an inference of discrimination. Starkey contends that she was subject to gender discrimination before her termination. Starkey stated that she applied for a position on the Technical Rescue Team, and that she was first on the list generated by the testing for a period of two years.  (Sullivan Aff. ¶ 2, Ex. 1 at 210.)  According to Starkey, after the list expired, five males were hired.  Starkey also claims that she was not notified of the opportunity to test for a fire captain position, which occurred when she was out sick due to a flare-up, and when she returned to work the deadline to apply had passed.  (*Id*. ¶ 2, Ex. 1 at 211-212.)

Starkey also claims that the City's testing and re-testing of her after she returned to work in January 2006, though she had been cleared by her personal physician, was treatment different from that of similarly situated males.  Chief Harklerode stated that, to his knowledge, there was no other case in which a decision that a firefighter was not able to perform the functions of the job was made by a non-physician.  (Sullivan Aff. ¶ 6, Ex. 5 at 26-27.)  The record also reflects that all other injured or sick firefighters who returned to work did so after being cleared by their personal physician, or after being cleared by the Park Nicollet Clinic-Airport.[12] (Sullivan Aff. ¶ 7, Ex. 6 at 24-25; Mavity

---

[12]     There were also several instances in which firefighters retired and did not return to work, but the parties do not rely on these as evidence either way.

Aff. ¶¶ 21, 22, Exs. S, T.)[13]  Chief Harklerode stated that the physical ability test which Starkey was given was not a condition of employment at the City.  (Sullivan Aff. ¶ 6, Ex. 5 at 32.)  Hansen acknowledged that no candidate or current member of the fire department had ever undergone testing like the testing to which Starkey was subjected. (Mavity Aff. ¶ 6, Ex. D at 38.)

They City contends, however, that it had never experienced a situation like that of Starkey's, in which a firefighter returns to work after being cleared by a personal physician and then experiences problems on the job.  The City, therefore, claims that there are no similarly situated male employees with which to compare Starkey.  Starkey, however, disputed that she had problems on the job both at the time some of the problems are said to have occurred, and in connection with discovery in this case.  The City also notes in a footnote that it required two or three male firefighters to pass the physical agility test, but the source it cites for this assertion does not offer clear support for the City's claim.  The City's reference is to two pages of Hansen's deposition in which she discusses two male firefighters.  (Mavity Aff. ¶ 21, Ex. S at 53-54.)  Hansen indicates as to one firefighter that she "understood" that he took the physical agility test, but that she did not know if he had passed, and that she did not know the date he took the test if he took it.  (*Id*.)  Hansen also did not know whether the second firefighter had passed the test.  She expressed a lack of familiarity with the cases of both of these firefighters, and stated that the information provided regarding them had come from Chief Harklerode.

---

[13]    Exhibits S and T to the Mavity Affidavit are subject to a protective order entered in this case.

As Starkey has established a *prima facie* case of gender discrimination, the burden shifts to the City to articulate a legitimate, non-discriminatory reason for her termination. The City has done so, based on its assertion that Starkey was unable to perform her duties as a firefighter due to her physical condition.  Starkey, however, has disputed the City's conclusion that she is unable to perform firefighting duties, and argues that the City intentionally engineered the result it wanted by its testing and re-testing of her, as discussed above.  Viewing the evidence in the light most favorable to Starkey, she has produced evidence that the City's reason was a pretext and that the true reason was discriminatory, and this evidence is sufficient to survive a motion for summary judgment.

## CONCLUSION

For the foregoing reasons, the Court grants the City's summary judgment motion as to Starkey's claim of disability discrimination.  The Court denies the City's motion as to Starkey's claim of gender discrimination.  Though Starkey's gender discrimination claim survives the City's summary judgment motion today, prevailing at the summary judgment stage in this instance is not tantamount to prevailing at trial, and Starkey must still prove her allegations.  The Court suggests that it is in the best interests of the parties to negotiate a resolution of this dispute prior to trial.  As the parties are aware, Magistrate Judge Susan Richard Nelson is available to assist in the negotiation of a settlement should the parties find such services to be helpful.

Now, therefore, **IT IS HEREBY ORDERED** that:

1.      Defendant City of Burnsville's Motion for Summary Judgment (Doc. No. 15) is **GRANTED IN PART** and **DENIED IN PART**, as follows:

a.      Defendant's Motion is **GRANTED** as to Count I of

Plaintiff's Amended Complaint (Doc. No. 3) and to the disability

discrimination claim under the Minnesota Human Rights Act alleged in

Count II of the Amended Complaint.

b.      Defendant's Motion is **DENIED** as to the gender

discrimination claim under the Minnesota Human Rights Act alleged in

Count II of the Amended Complaint.


Dated:  July 15, 2008                    s/Donovan W. Frank
                                         DONOVAN W. FRANK
                                         Judge of United States District Court